# UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF WISCONSIN

CARESTREAM HEALTH, INC.

          Plaintiff,

    v.

CALIPER LIFE SCIENCES, INC.

          Defendant.

Case No.: 10-cv-381

## MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

Dated:  July 9, 2010

John A. Bannon
SCHIFF HARDIN LLP
233 S. Wacker Drive, Suite 6600
Chicago, Illinois 60606
312-258-5500 tel.
312-258-5600 fax

Of counsel:

Stephen M. Hankins
Paul M. Previde
SCHIFF HARDIN LLP
One Market
Spear Street Tower, Thirty-Second Floor
San Francisco, CA 94105
415-901-8700 tel.
415-901-8701 fax

Luke T. Shannon
Shelley L. Merkin
SCHIFF HARDIN LLP
233 S. Wacker Drive, Suite 6600
Chicago, Illinois 60606
312-258-5500 tel.
312-258-5600 fax

**Counsel for Carestream Health, Inc.**

## <u>TABLE OF CONTENTS</u>

BACKGROUND AND INTRODUCTION ................................................................ 1

STATEMENT OF FACTS ...................................................................................... 4

DISCUSSION ......................................................................................................... 4

I.    CARESTREAM HAS NO ADEQUATE REMEDY AT LAW AND WILL
SUFFER IRREPARABLE HARM BY THE ABSENCE OF THE
PRELIMINARY INJUNCTION. .......................................................................... 5

       A.    The Status Quo To Be Preserved Is That Carestream's Imaging Equipment
Utilized Now-Patented Inventions That Differentiated It From Caliper
And Allowed It To Capture Market Share.............................................. 5

       B.    Without A Preliminary Injunction, Carestream Will Permanently Lose The
Opportunity To Increase Its Market Share............................................. 7

       C.    Without A Preliminary Injunction, Carestream Will Lose The Opportunity
To Form Long-Term Customer Relationships And Will Lose The
Attendant Benefits Of Those Relationships........................................... 8

       D.    Without A Preliminary Injunction, Carestream Will Lose The Opportunity
To Enhance Its Reputation And Good Will............................................. 10

II.    CARESTREAM HAS A LIKELIHOOD OF SUCCESS ON THE MERITS OF
ITS PATENT INFRINGEMENT CLAIM. ........................................................... 11

       A.    Caliper's Lumina XR Product Infringes The '325 Patent ................... 12

            1.    Overview of Caliper's Infringement........................................ 13

            2.    Caliper's Past and Continuing Sales Infringe the '325 Patent
Directly. ................................................................................... 14

            3.    Caliper's Past and Continuing Commercialization of the Lumina
XR Constitutes Inducement and Contributory Infringement of the
'325 Patent. ............................................................................. 15

       B.    Caliper's Request for Re-Examination Of The '325 Patent Does Not Upset
The Presumption Of Validity................................................................. 16

            1.    Caliper Cannot Rely Upon Its Filing Of A Request For
Reexamination. ....................................................................... 17

            2.    Any Merit Of Caliper's Self-Serving Reexamination Request Is
Speculative. ............................................................................. 19

III.    THE BALANCE OF HARDSHIPS FAVORS CARESTREAM. .................................... 19

    A.    As The Market Entrant, Carestream Will Be Crippled By The Loss Of Market Share, Customers And Reputation ........................................................... 20

    B.    With Knowledge Of Carestream's Invention And In The Face Of The Pending And Now-Issued Patent, Caliper Nevertheless Appropriated The Invention And Proceeded To Sell Imaging Equipment Utilizing It. .................... 21

IV.    THE PUBLIC INTEREST FAVORS THE ENTRY OF A PRELIMINARY INJUNCTION. ................................................................................................................ 21

CONCLUSION ..................................................................................................................... 23

# TABLE OF AUTHORITIES

## CASES

*Abbott Labs v. Andrx Pharms., Inc.*,
    473 F.3d 1196 (Fed. Cir. 2007).......................................................................... 16

*Abbott Labs. v. Sandoz, Inc.*,
    500 F. Supp. 2d 807 (N.D. Ill. 2007) ................................................................ 17

*Abbott Labs. v. Sandoz, Inc.*,
    544 F.3d 1341 (Fed. Cir. 2008)................................................................ 4, 7, 22

*Amphenol T & M Antennas, Inc. v. Centurion Int'l, Inc.*,
    No. 00 C 4298, 2002 WL 32373639 (N.D. Ill. Jan. 17, 2002) ........................ 18

*Anton/Bauer, Inc. v. PAG, Ltd.*,
    329 F.3d 1343 (Fed. Cir. 2003).......................................................................... 5

*Atlas Powder Co. v. Ireco Chems.*,
    773 F.2d 1230 (Fed. Cir. 1985)....................................................................... 6, 7

*Baker Hughes Inc. v. Nalco Co.*,
    676 F. Supp. 2d 547 (S.D. Tex. 2009) ............................................................. 10

*BarTex Research, LLC v. FedEx Corp.*,
    611 F. Supp. 2d 647 (E.D. Tex. 2009) ....................................................... 17, 18

*Bio-Tech. Gen. Corp. v. Genentech, Inc.*,
    80 F.3d 1553 (Fed. Cir. 1996).......................................................................... 11

*Braun Inc. v. Dynamics Corp. of Am.*,
    975 F.2d 815 (Fed. Cir. 1992)........................................................................... 12

*Canon Computer Sys., Inc. v. Nu-Kote Int'l, Inc.*,
    134 F.3d 1085 (Fed. Cir. 1998)........................................................................ 16

*Canon, Inc. v. GCC Int'l Ltd.*,
    No. 2006-1615, 2008 WL 213883 (Fed. Cir. Jan. 25, 2008) ............................ 5

*CVI/Beta Ventures, Inc. v. Custom Optical Frames, Inc.*,
    893 F. Supp. 508 (D. Md. 1995) ...................................................................... 10

*Dow Chem. Co. v. Sumitomo Chem. Co., Ltd.*,
    257 F.3d 1364 (Fed. Cir. 2001)........................................................................ 12

*Duct-O-Wire Co. v. U.S. Crane, Inc.*,
    31 F.3d 506 (7th Cir. 1994) ............................................................................... 8

*Gateway Eastern Railway Co. v. Terminal Railroad Assoc. of St. Louis,*
   35 F.3d 1134 (7th Cir. 1994) ........................................................................ 10

*Gemmy Indus. Corp. v. Chrisha Creations Ltd.,*
   452 F.3d 1353 (Fed. Cir. 2006)...................................................................... 16

*H.H. Robertson, Co. v. United Steel Deck, Inc.,*
   820 F.2d 384 (Fed. Cir. 1987)........................................................................ 12

*Henkel Corp. v. Coral, Inc.,*
   754 F. Supp. 1280 (N.D. Ill. 1990) ................................................................ 21

*Hoechst Celanese Corp. v. BP Chems. Ltd.,*
   78 F.3d 1575 (Fed. Cir. 1996)........................................................................ 18

*Hybritech Inc. v. Abbott Labs.,*
   849 F.2d 1446 (Fed. Cir. 1988).......................................................... 5, 8, 19, 22

*Incredible Techs., Inc. v. Virtual Techs., Inc.,*
   400 F.3d 1007 (7th Cir. 2005) ......................................................................... 5

*Intervet Am., Inc. v. Kee-Vet Labs., Inc.,*
   887 F.2d 1050 (Fed. Cir. 1989)...................................................................... 12

*Jack Guttman, Inc. v. Kopykake Enters., Inc.,*
   302 F.3d 1352 (Fed. Cir. 2002)...................................................................... 12

*Oakley, Inc. v. Sunglass Hut Int'l,*
   316 F.3d 1331 (Fed. Cir. 2003)...................................................................... 12

*P.N.A. Constr. Techs., Inc. v. McTech Group, Inc.,*
   414 F. Supp. 2d 1228 (N.D. Ga. 2006) ............................................................ 6

*Pfizer, Inc. v. Teva Pharms., USA, Inc.,*
   429 F.3d 1364 (Fed. Cir. 2005)...................................................................... 20

*Presidio Components Inc. v. Am. Tech. Ceramics Corp.,*
   No. 08-CV-335-IEG, 2009 WL 3822694 (S.D. Cal. Nov. 13, 2009) ........................ 18, 19

*Promatek Indus., Ltd. v. Equitrac Corp.,*
   300 F.3d 808 (7th Cir. 2002) ........................................................................ 10

*Purdue Pharma L.P. v. Boehringer Ingelheim GmbH,*
   237 F.3d 1359 (Fed. Cir. 2001)...................................................................... 11

*Quantronix, Inc. v. Data Trak Techs., Inc.,*
   536 F. Supp. 2d 1039 (D. Minn. 2008) ............................................................. 7

*Sanofi-Synthelabo v. Apotex, Inc.*,
    470 F.3d 1368 (Fed. Cir. 2006)..................................................................... 21, 22

*Seal-Flex, Inc. v. Athletic Track & Court Constr.*,
    172 F.3d 836 (Fed. Cir. 1999) ............................................................................ 13

*SRI Int'l v. Matsushita Elec. Corp. of Am.*,
    775 F.2d 1107 (Fed. Cir. 1985)........................................................................... 13

*Stiftung v. Renishaw PLC*,
    945 F.2d 1173 (Fed. Cir. 1991) .......................................................................... 12

*Techtronic Indus. Co., Ltd. v. Chevron Holdings Ltd.*,
    395 F. Supp. 2d 720 (N.D. Ill. 2005) ................................................................. 22

*Ticor Title Ins. Co. v. Cohen*,
    173 F.3d 63 (2d Cir. 1999).................................................................................... 8

*Titan Tire Corp. v. Case New Holland, Inc.*,
    566 F.3d 1372 (Fed. Cir. 2009)........................................................................... 17

*Trading Techs. Int'l, Inc. v. eSpeed, Inc.*,
    370 F. Supp. 2d 691 (N.D. Ill. 2005) ................................................................... 5

*Water Tech. Corp. v. Calco, Ltd.*,
    850 F.2d 660 (Fed. Cir. 1988)............................................................................. 15

## STATUTES

35 U.S.C. § 271 .......................................................................................................... 15

35 U.S.C. § 282 .......................................................................................................... 16

35 U.S.C. § 283 ............................................................................................................ 4

In support of its Motion For Preliminary Injunction, plaintiff Carestream Health, Inc., ("Carestream") submits this Memorandum, the separately-filed Statement Of Facts Movant Intends To Prove At An Evidentiary Hearing, and the separately-filed Declaration of William E. McLaughlin.

## BACKGROUND AND INTRODUCTION

Carestream seeks a preliminary injunction in support of its suit for patent infringement against Caliper Life Sciences, Inc. ("Caliper"). Carestream and Caliper, among other things, are both in the business of developing, selling and maintaining molecular imaging systems used in medical and life sciences research. (SOF ¶ 7; McLaughlin Decl. ¶ 7.)[1] This lawsuit involves the market for such molecular imaging systems to be used on live animals, known as "*in vivo*" systems. (SOF ¶ 8; McLaughlin Decl. ¶ 8.)

Carestream had developed an *in vivo* molecular imaging system that was "multi-modal" and included x-ray imaging. (SOF ¶ 9; McLaughlin Decl. ¶ 9.) The system was capable of rendering more than one type of molecular image within the same system without moving the sample of interest. For example, one type of imaging method may use x-rays and another imaging method may involve detecting and imaging fluorescence emanating from certain chemicals used in the experimental process. Carestream's new multi-modal system was capable of performing both types of imaging without moving the sample of interest. Carestream's apparatus and method for multi-modal imaging were new and Carestream applied for a U.S. Patent. Carestream's patent application was made public in March 2006 and was granted on

---

[1] Specific facts referred to in this memorandum shall be identified by the appropriate paragraph numbers in (i) Carestream's separately-filed Statement Of Facts Movant Intends To Prove At An Evidentiary Hearing (the "SOF") and (ii) the Declaration of William E. McLaughlin (the "McLaughlin Decl.").

June 8, 2010 (U.S. Patent No. 7,734,325, the "'325 Patent"). (SOF ¶ 10; McLaughlin Decl. ¶ 10.)

In late 2005, Carestream introduced its multi-modal imaging systems incorporating its new and patent-applied-for technology. (SOF ¶ 11; McLaughlin Decl. ¶ 11.) At the time, it was the only commercial manufacturer selling a molecular imaging system with multi-modal capabilities that included optical imaging. (SOF ¶ 12; McLaughlin Decl. ¶ 12.) Accordingly, while a new entrant in the *in vivo* market, Carestream's multi-modal features differentiated its product from all of the other *in vivo* imaging systems. (SOF ¶ 13; McLaughlin Decl. ¶ 13.) The marketplace of researchers and scientists responded very favorably to Carestream's new multi-modal capabilities. (SOF ¶ 14; McLaughlin Decl. ¶ 14.)

These kinds of imaging systems are expensive—Carestream's "In-Vivo Multispectral Imaging System FX" model, for example, sells for around $175,000—and are generally replaced or upgraded every five to eight years. (SOF ¶ 15; McLaughlin Decl. ¶ 15.) As potential customers began to initially purchase, replace, or upgrade their *in vivo* imaging systems, Carestream began to capture those sales. (SOF ¶ 16; McLaughlin Decl. ¶ 16.) Over the next several years, Carestream's share of the *in vivo* molecular imaging market increased from essentially zero to an estimated 10%. (SOF ¶ 17; McLaughlin Decl. ¶ 17.)

Caliper, on the other hand, was, and still is, the leader in the *in vivo* molecular imaging systems market by a considerable margin. (SOF ¶ 18; McLaughlin Decl. ¶ 18.) In 2006, Caliper did not sell a multi-modal *in vivo* imaging system that was capable of rendering more than one type of molecular image within the same system without moving the sample of interest. (SOF ¶ 19; McLaughlin Decl. ¶ 19.) After Carestream began selling its new multi-modal *in vivo* system, and well after Carestream's patent application describing its technology

was made public, Caliper developed, announced, and in September 2009 began selling, a multi-modal *in vivo* imaging system, the IVIS Lumina XR (the "Lumina XR system"). (SOF ¶¶ 20-21; McLaughlin Decl. ¶¶ 20-21.) Caliper's Lumina XR system, moreover, employed the same technology as Carestream's Multispectral systems—the same technology disclosed in Carestream's patent application. (SOF ¶ 22; McLaughlin Decl. ¶ 22.)

On June 8, 2010, the '325 Patent was issued and this patent infringement litigation resulted. Carestream asks the Court to preliminarily enjoin Caliper from continuing to market and sell its infringing Lumina XR systems during the pendency of this lawsuit and, subsequently, to permanently enjoin such sales.

Carestream was a new entrant into the *in vivo* marketplace with innovations that were desired and embraced by the market. As a result, it was able to steadily increase its share of the *in vivo* market until the market leader, Caliper, copied Carestream's inventions and began selling the same technology. Furthermore, Caliper almost certainly was aware of Carestream's pending patent application and jumped the gun to gain significant strategic advantages in the market before Carestream's patent issued.

As set forth herein, the market effects caused by permitting Caliper's continued sales of its infringing Lumina XR system are pervasive and permanent. Simply paying Carestream for its lost profits does not begin to adequately compensate Carestream for the harm Caliper has caused and will continue to cause during this litigation. The low-volume, high-dollar, nature of the *in vivo* molecular imaging market means that Caliper's first sale of an *in vivo* multi-modal molecular imaging system is likely the *only* sale to that customer for the next five to eight years. Carestream loses not only the profits from the sale, but also loses market share it will be unable to recapture. Accordingly, it will lose customer relationships which are important

-3-

in identifying and obtaining future opportunities, as well as in developing and maintaining reputation and goodwill in the *in vivo* market. In addition, because imaging technology is continuously evolving, the first sale may be the *only* sale because a new generation of products is inevitable over the next five to eight years.

None of these market effects is compensable in money. Carestream is irreparably harmed by each and every one of Caliper's infringing sales. Indeed, by copying Carestream's innovations and selling systems with the same now-patented technology, Caliper is systematically locking up potential customers and, in turn, gaining strategic advantages that it will keep *even if it is found to be an infringer*. Accordingly, Carestream is entitled to a preliminary injunction.

## **STATEMENT OF FACTS**

Carestream incorporates by reference (i) its separately-filed Statement Of Facts Movant Intends To Prove At An Evidentiary Hearing (the "SOF") and (ii) the separately-filed Declaration of William E. McLaughlin (the "McLaughlin Decl."). Specific facts referred to in this memorandum shall be identified by the appropriate paragraph numbers in those documents.

## **DISCUSSION**

The Patent Act protects a patent owner's rights in its invention by giving courts the ability to preliminarily enjoin infringers "to prevent the violation of any right secured by patent, on such terms as the court deems reasonable." 35 U.S.C. § 283. A party seeking preliminary injunctive relief must establish a right thereto in light of four factors: (1) likelihood of success on the merits; (2) irreparable harm if relief is not granted; (3) balance of hardships; and (4) public interest. *Abbott Labs. v. Sandoz, Inc.*, 544 F.3d 1341, 1344 (Fed. Cir. 2008).

While a court must evaluate all four factors, a movant can show entitlement to injunctive relief by satisfying the first two factors. *Anton/Bauer, Inc. v. PAG, Ltd.*, 329 F.3d

1343, 1348 (Fed. Cir. 2003) ("[T]he movant must establish at the very least both of the first two factors; i.e., a likelihood of success on the merits and irreparable harm."); *Trading Techs. Int'l, Inc. v. eSpeed, Inc.*, 370 F. Supp. 2d 691, 703 (N.D. Ill. 2005) ("The two most critical factors in determining whether to grant or deny a preliminary injunction are the likelihood of success and irreparable harm.").

## I. CARESTREAM HAS NO ADEQUATE REMEDY AT LAW AND WILL SUFFER IRREPARABLE HARM BY THE ABSENCE OF THE PRELIMINARY INJUNCTION.

To obtain a preliminary injunction, a plaintiff must demonstrate that "there is no adequate remedy at law, and that it will suffer irreparable harm without injunctive relief." *Incredible Techs., Inc. v. Virtual Techs., Inc.*, 400 F.3d 1007, 1011 (7th Cir. 2005). "At the preliminary injunction stage, irreparable harm consists of harm that could not be sufficiently compensated by money damages or avoided by a later decision on the merits." *Canon, Inc. v. GCC Int'l Ltd.*, No. 2006-1615, 2008 WL 213883, at *4 (Fed. Cir. Jan. 25, 2008). A preliminary injunction is designed to "preserve the legal interests of the parties against future infringement which may have market effects never fully compensable in money." *Hybritech Inc. v. Abbott Labs.*, 849 F.2d 1446, 1456-57 (Fed. Cir. 1988).

As set forth herein, the market effects caused by permitting Caliper's continued sales of its infringing Lumina XR system are pervasive and permanent. None of these market effects is compensable in money. Carestream is irreparably harmed by each and every one of Caliper's infringing sales. Accordingly, Carestream is entitled to a preliminary injunction.

### A. The Status Quo To Be Preserved Is That Carestream's Imaging Equipment Utilized Now-Patented Inventions That Differentiated It From Caliper And Allowed It To Capture Market Share.

"A principal purpose of preliminary injunctive relief is to maintain the status quo." *P.N.A. Constr. Techs., Inc. v. McTech Group, Inc.*, 414 F. Supp. 2d 1228, 1244 (N.D. Ga.

2006). "Status quo" does not mean, however, that an infringer is permitted to continue infringing until the litigation is resolved. *Atlas Powder Co. v. Ireco Chems.*, 773 F.2d 1230, 1231 (Fed. Cir. 1985) ("[Defendant] would have us maintain the status quo by allowing it to continue the alleged infringements at the rate they occurred when the suit was filed, even though the assessment of likelihood of success has shown that such acts would probably be held unlawful. Such a proposition is its own refutation and no other is necessary."). Permitting the infringer to continue the wrong "is in no realistic sense maintaining the status quo." *Id.* at 1231-32 ("Status quo is not a talisman to dispose of the question by itself.").

Here, the status quo that should be preserved are the protections of Carestream's presumptively valid patent. Carestream developed innovations that the *in vivo* marketplace desired. Carestream sought and eventually obtained patent protection for those innovations. Caliper nevertheless appropriated Carestream's innovations before the patent issued and began selling the same technology for purely strategic purposes. Indeed, from Caliper's point-of-view, even if Carestream prevails in this litigation, for each illegal sale Caliper manages to make, Caliper will have the upper hand in improperly continuing to increase its dominant growing market share, its long-term customer relationships, and its reputation—all to the exclusion of Carestream.

In order to preserve the status quo, then, Caliper should be preliminarily enjoined from continuing its wrongful conduct, regardless of the sales it made before the '325 Patent issued:

> [A] preliminary injunction preserves the status quo if it prevents future trespasses but does not undertake to assess the pecuniary or other consequences of past trespasses. If [the infringer] has allowed itself to become excessively dependent upon infringing sales, the status quo catchword does not necessarily allow it to continue such dependence.

*Id.* There is no adequate remedy at law for these harms. Enough sales will occur during the pendency of the lawsuit to seriously and irreparably harm Carestream.

**B.    Without A Preliminary Injunction, Carestream Will Permanently Lose The Opportunity To Increase Its Market Share**

Because of the effect on Carestream's market share, the damages caused by sales made by Caliper during the pendency of this lawsuit cannot be adequately compensated merely by a payment of Carestream's lost profits. Carestream not only loses the sale, but also loses the corresponding share of the *in vivo* market for an extended period. Loss of market opportunities cannot be quantified or adequately compensated and is evidence of irreparable harm. *Sandoz*, 544 F.3d at 1362; *Quantronix, Inc. v. Data Trak Techs., Inc.*, 536 F. Supp. 2d 1039, 1049-50 (D. Minn. 2008) (court found irreparable injury based on "loss of business opportunity").

In the *in vivo* molecular imaging systems market, the individual systems are expensive. (SOF ¶ 25; McLaughlin Decl. ¶ 25.) Once a system is sold, it likely will not be replaced for five to eight years. (SOF ¶ 26; McLaughlin Decl. ¶ 26.) Accordingly, the most important sale is the first sale because a long-term customer relationship is necessarily established. (SOF ¶ 27; McLaughlin Decl. ¶ 27.) Furthermore, there is no opportunity for a competitor to recapture the customer during this extended period. (SOF ¶ 28; McLaughlin Decl. ¶ 28.) In addition to being a low-volume, high-dollar market, the technology is constantly evolving. (SOF ¶ 29; McLaughlin Decl. ¶ 29.) Accordingly, the initial seller may get the only sale of current technology and has the advantage in selling the next-generation of imaging equipment. (SOF ¶ 30; McLaughlin Decl. ¶ 30.)

Without a preliminary injunction, Carestream not only loses the sale, but also loses the corresponding share of the *in vivo* market for an extended period. The primary

advantage of the '325 Patent is the ability it gives Carestream to make the *first* sale of the multi-modal innovations.  (SOF ¶ 32; McLaughlin Decl. ¶ 32.)

C.    **Without A Preliminary Injunction, Carestream Will Lose The Opportunity To Form Long-Term Customer Relationships And Will Lose The Attendant Benefits Of Those Relationships.**

In addition to losing market share, for each wrongful sale by Caliper during the pendency of the lawsuit, Carestream also loses the long term customer relationships and attendant benefits of those relationships which cannot be adequately compensated by a payment of lost profits.  (SOF ¶ 33; McLaughlin Decl. ¶ 33.)  Where the infringer had a large presence in the market, like Caliper does, and the patent helps the patentee "establish a market position and create business relationships in the market," irreparable harm is found.  *Hybritech*, 849 F.2d at 1456.

The loss of the "opportunity to maintain and develop relationships with existing and potential customers" also constitutes irreparable harm. *Duct-O-Wire Co. v. U.S. Crane, Inc.*, 31 F.3d 506, 509-10 (7th Cir. 1994) (finding irreparable harm from lost customer opportunities); *Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 69 (2d Cir. 1999) ("It is very difficult to calculate monetary damages that would successfully redress the loss of a relationship with a client that would produce an indeterminate amount of business in years to come.").

In the *in vivo* imaging systems market, if Carestream is deprived of the first sale, it will not have another opportunity with the customer for five to eight years.  (SOF ¶ 34; McLaughlin Decl. ¶ 34.)

Along with the sale, Caliper or Carestream will form a long-term relationship with the customer.  The seller also provides technical support and training, as well as service and maintenance for the *in vivo* molecular imaging system.  (SOF ¶¶ 36-37; McLaughlin Decl. ¶¶ 36-

37.) In addition, the relationship between the seller and the customer is reinforced by visits from the seller's scientists and its product managers. (SOF ¶ 38; McLaughlin Decl. ¶ 38.)

Even if Caliper is found to be an infringer, it will have a continued presence and relationship with that customer through technical support and service personnel and well as through contact by Caliper's scientists and marketers for five to eight years. (SOF ¶ 39; McLaughlin Decl. ¶ 39.) The strategic business advantages for such an extended exclusive customer relationship are significant.

For example, through its interaction with the customer, the seller will have the ability to understand how the product is being used, as well as the particular requirements and features that the customer would like to see implemented. (SOF ¶ 41; McLaughlin Decl. ¶ 41.) That interaction gives the seller a strategic advantage in developing future products. The seller also has an advantage in marketing the next-generation system to an existing customer. (SOF ¶ 42; McLaughlin Decl. ¶ 42.)

Another strategic advantage is that existing customers will discuss and show the imaging system to potential customers which may generate additional interest, even more sales and, in turn, additional customer relationships. (SOF ¶ 43; McLaughlin Decl. ¶ 43.) For example, an initial sale to a customer in a particular department at a university may generate sales in other departments at the university or in similar departments at other universities. (SOF ¶ 44; McLaughlin Decl. ¶ 44.) Similarly, researchers often move to different research institutions. A researcher with exposure to the seller's imaging systems may generate interest in the product at her new research institution, which may lead to additional sales and additional customer relationships. (SOF ¶ 45; McLaughlin Decl. ¶ 45.)

An additional strategic advantage from the seller's relationship with the customer is the opportunity to identify research programs that have significant growth potential. (SOF ¶ 46; McLaughlin Decl. ¶ 46.) For example, research involving a particular drug may expand from animal research to human studies. The seller, of course, is positioned to take advantage of any additional sales opportunities—which may be significant. Simply put, the larger the seller's market share, the more likely this kind of research will discovered.

All of these advantages are associated with the first sale and cannot be quantified or compensated for by lost profits. Without a preliminary injunction, Carestream will lose each sale, customer relationship and customer opportunity made by Caliper.

**D.    Without A Preliminary Injunction, Carestream Will Lose The Opportunity To Enhance Its Reputation And Good Will.**

Without a preliminary injunction, with each sale made by Caliper during the pendency of the lawsuit, Carestream will lose an opportunity to be favorably cited in scientific publications—depriving it of an opportunity to increase its reputation and goodwill in the molecular imaging community. (SOF ¶ 49; McLaughlin Decl. ¶ 49.) "Irreparable harm has been found where a patentee's market reputation and goodwill would not be fully compensable with money damages." *CVI/Beta Ventures, Inc. v. Custom Optical Frames, Inc.*, 893 F. Supp. 508, 524 (D. Md. 1995); *Baker Hughes Inc. v. Nalco Co.*, 676 F. Supp. 2d 547, 554 (S.D. Tex. 2009) ("[A]bsent an injunction, [plaintiff] will suffer irreparable harm through damage to its reputation in the pertinent market.").

In *Gateway Eastern Railway Co. v. Terminal Railroad Assoc. of St. Louis*, the Seventh Circuit determined that loss of goodwill constitutes irreparable harm because the loss is impossible to calculate into a monetary figure. 35 F.3d 1134, 1140 (7th Cir. 1994); *Promatek Indus., Ltd. v. Equitrac Corp.*, 300 F.3d 808, 813 (7th Cir. 2002) ("Because of the difficulty in

-10-

assessing the damages associated with a loss of goodwill, the district court was correct in finding that [plaintiff] lacked an adequate remedy at law."); *see also Bio-Tech. Gen. Corp. v. Genentech, Inc.*, 80 F.3d 1553, 1566 (Fed. Cir. 1996) (Federal Circuit affirmed district court's finding that patentee would be irreparably harmed by loss of revenues and goodwill.).

*In vivo* molecular imaging systems are sold to research institutions. Researchers, in turn, publish their results and in their papers favorably cite the molecular imaging systems they employed in conducting their research. (SOF ¶ 50; McLaughlin Decl. ¶ 50.) Citations in research are an important source of reputation and goodwill in the marketplace. (SOF ¶ 51; McLaughlin Decl. ¶ 51.) Indeed, being cited in influential publications is the most important source of recognition, reputation and goodwill. (*Id.*)

Without a preliminary injunction, for each sale made by Caliper, Carestream is deprived of the opportunity for favorable research citations by that customer for the next five to eight years. Ironically, even if Caliper is found to be an infringer, Caliper's infringing system will still be cited in research and Caliper will still reap the benefits of such citations on its reputation and goodwill.

## II.    CARESTREAM HAS A LIKELIHOOD OF SUCCESS ON THE MERITS OF ITS PATENT INFRINGEMENT CLAIM.

In order to establish likelihood of success on the merits, the patentee must show that (1) it will likely prove infringement, and (2) its infringement claim will likely withstand challenges to the validity and enforceability of the patent. *Purdue Pharma L.P. v. Boehringer Ingelheim GmbH*, 237 F.3d 1359, 1363 (Fed. Cir. 2001).

Demonstrating reasonable likelihood of success as to infringement "does not require that infringement be proved beyond all question, or that there be no evidence supporting the viewpoint of the accused infringer." *H.H. Robertson, Co. v. United Steel Deck, Inc.*, 820

F.2d 384, 390 (Fed. Cir. 1987) (abrogated on other grounds).  Nor is the patentee required to show infringement of all claims; rather, the patentee must show merely that it will likely prove infringement of any one claim.  *Intervet Am., Inc. v. Kee-Vet Labs., Inc*., 887 F.2d 1050, 1055 (Fed. Cir. 1989).

At trial, the patentee need only establish infringement by a preponderance of the evidence.  *See, e.g., Braun Inc. v. Dynamics Corp. of Am.*, 975 F.2d 815, 819 (Fed. Cir. 1992).  If each element recited in the claims is found in an accused product, the manufacturer of the accused product cannot avoid infringement merely by identifying additional elements.  *Stiftung v. Renishaw PLC*, 945 F.2d 1173, 1178 (Fed. Cir. 1991).  Likewise, an accused method "does not avoid literally infringing a method claim . . . simply because it employs *additional* steps."  *Dow Chem. Co. v. Sumitomo Chem. Co., Ltd.*, 257 F.3d 1364, 1380 (Fed. Cir. 2001).

In order to evaluate Caliper's infringement of the '325 Patent, the Court must conduct the same two-step analysis that it would conduct in an infringement analysis at a later stage of litigation.  First, it must determine the scope and meaning of the claims.  *Oakley, Inc. v. Sunglass Hut Int'l*, 316 F.3d 1331, 1339 (Fed. Cir. 2003).  Then it must compare the claims to the infringing products, specifically Caliper's Lumina XR product line.  *Id.*

In applying the claims to the Lumina XR products, the Court need not issue a final claim construction at the preliminary injunction phase, and can instead "engage in a rolling claim construction, in which the court revisits and alters its interpretation of the claim terms as its understanding of the technology evolves."  *Jack Guttman, Inc. v. Kopykake Enters., Inc.*, 302 F.3d 1352, 1361 (Fed. Cir. 2002).

A.    **Caliper's Lumina XR Product Infringes The '325 Patent**

The publicly-available user manuals that accompany the Lumina XR system leave no doubt that this product falls squarely with in the '325 Patent's claims.  The '325 Patent

includes both system and method claims.  Infringement of a patent's claims occurs when each limitation of a properly interpreted claim is found in the accused product or process.  *Seal-Flex, Inc. v. Athletic Track & Court Constr.*, 172 F.3d 836, 842 (Fed. Cir. 1999).  Infringement is determined by comparing an accused product not with a preferred embodiment described in the specification, but with the claim itself.  *SRI Int'l v. Matsushita Elec. Corp. of Am.*, 775 F.2d 1107, 1121 (Fed. Cir. 1985).

### 1.    Overview of Caliper's Infringement

As described in more detail in the infringement claim chart accompanying this Motion as **Exhibit 1**, and supporting references, Carestream is highly likely to prove that Caliper's Lumina XR product line infringes the claims of the '325 Patent.  Among other things, one of the key improvements offered by the claimed invention of the '325 Patent over existing technology is the ability to perform imaging in a first imaging mode (X-ray) and a second imaging mode (fluorescence or luminescence) without moving the object under study, for example, a mouse.  (SOF ¶ 56; McLaughlin Decl. ¶ 56.)  One of the advantages offered by the claimed invention of the '325 Patent involves the use of a movable phosphor plate which occupies one position to support the X-ray imaging mode and can be moved out of the way to a second position during the second imaging mode.  (SOF ¶ 57; McLaughlin Decl. ¶ 57.)  Not having to move the mouse permits the two image types to be accurately merged into a single image.  (*Id.*)  The single merged image offers the customer the highly sought-after improvement of more accurate and detailed localization of the light being detected from the subject mouse.  (SOF ¶ 58; McLaughlin Decl. ¶ 58.)

Among other things, the following key features of the Lumina XR highlight the infringement of the '325 Patent:

- The Lumina XR includes a support member, in the form of a plate, which holds the object under study (such as a mouse) in an immobilized state, which may include a sedated state. (SOF ¶ 65; McLaughlin Decl. ¶ 65.) The object generally is under study in the course of scientific research, such as disease research. (*Id.*)

- The imaging unit of the Lumina XR carries out the imaging of the immobilized object in both of the imaging modes claimed in the '325 Patent. (SOF ¶ 66; McLaughlin Decl. ¶ 66.) First, the Lumina XR is equipped with an X-ray imaging mode. (*Id.*) Second, the Lumina XR is equipped with a second imaging mode that uses light from the object, including either luminescence mode or fluorescence mode. (*Id.*)

- The Lumina XR includes a movable phosphor plate which converts the X-rays passing through the object into visible light. (SOF ¶ 67; McLaughlin Decl. ¶ 67.) That visible light is captured by the instrument as a first image, taken in a first imaging mode according to the claims of the '325 Patent. (*Id.*)

- The phosphor plate of the Lumina XR moves between two positions. (SOF ¶ 68; McLaughlin Decl. ¶ 68.) One position is used during X-ray mode, when the phosphor plate is in a position proximate the support member for the object so that the incident X-rays are converted by the phosphor plate into visible light, in accordance with the plate's function. (*Id.*) When the Lumina XR carries out the second imaging mode, such as fluorescence or luminescence, the phosphor plate is no longer needed and therefore is moved to a second position so that it is out of the way while the instrument captures the second image. (*Id.*)

In accordance with the '325 Patent's claims, the Lumina XR employs the movement of the phosphor plate to perform imaging in an X-ray mode and a second imaging mode using fluorescence or luminescence, *without* moving the object under study. (SOF ¶ 69; McLaughlin Decl. ¶ 69.) Through this infringement, Caliper can market and sell the Lumina XR product line as featuring one of the key improvements offered by the claimed invention of the '325 Patent over existing technology. (*Id.*)

## 2. Caliper's Past and Continuing Sales Infringe the '325 Patent Directly.

The Court need not complete a formal claim construction process in order to conclude that Carestream is likely to succeed in providing infringement in this case. Caliper's own publicly-available manuals demonstrate clearly that its Lumina XR product line infringes the claims of the '325 Patent, as set forth fully in the infringement claim chart submitted as

**Exhibit 1** to this Motion.  From a direct infringement standpoint, the claim chart and appended materials establish at the very least that Carestream is significantly likely to prove that Caliper directly infringes system claims 1-2, and 5-8 of the '325 Patent.

>    3.    **Caliper's Past and Continuing Commercialization of the Lumina XR Constitutes Inducement and Contributory Infringement of the '325 Patent.**

Carestream is also likely to prove that Caliper's activities constitute indirect infringement.  First, Caliper's sales and accompanying product literature induce its customers to infringe the '325 Patent.  Liability for inducement of infringement under 35 U.S.C. § 271(b) arises when the defendant knew of the patent and it "actively and knowingly aid[ed] and abet[ed] another's direct infringement."  *Water Tech. Corp. v. Calco, Ltd.*, 850 F.2d 660, 668 (Fed. Cir. 1988) (emphasis omitted).  The infringement claim chart contained in **Exhibit 1** demonstrates conclusively that Caliper's Lumina XR system performs each and every method step of claims 3-4 and 9-10.  Further, the clear and unambiguous instructions presented in the system manuals appended to the claim chart direct purchasers of the Lumina XR system to take steps that infringe claims 3-4 and 9-10.[2]

Caliper also contributes to its customers' infringement of the '325 Patent.  The definition of contributory infringement is set forth in 35 U.S.C. § 271(c):

> Whoever . . . sells . . . a component, . . . manufacture, . . . or a material or apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement

---

[2] As the case proceeds to discovery, the identities of Caliper's customers who have purchased and are using Lumina XR systems will become known.  Even without discovery, one such customer has been identified through publicly available sources.  Specifically, the web site of the New York University Langone Medical Center in New York, New York, presents an announcement, attached to this Motion as **Exhibit 2**, for the purchase of a Lumina XR system for its facility.

-15-

of such patent, and not a staple article or commodity of commerce suitable for substantial non-infringing use, shall be liable as a contributory infringer.

Caliper knows that its Lumina XR system is especially adapted to infringe the '325 Patent. As highlighted by Caliper's own user manuals, the very reason why customers would purchase an Lumina XR system, instead of other Caliper *in vivo* imaging systems is to practice the methods claimed in the '325 Patent. The inescapable conclusion is that Caliper's sales of the Lumina XR system to its customers constitutes contributory infringement.

**B.    Caliper's Request for Re-Examination Of The '325 Patent Does Not Upset The Presumption Of Validity.**

Patents are presumed valid. 35 U.S.C. § 282. This presumption exists at every stage of litigation, including the preliminary injunction stage. *Canon Computer Sys., Inc. v. Nu-Kote Int'l, Inc.*, 134 F.3d 1085, 1088 (Fed. Cir. 1998). To defeat Carestream's motion, Caliper must demonstrate by clear and convincing evidence that the patent is invalid. 35 U.S.C. § 282.

Caliper will bear the burden at trial to demonstrate by clear and convincing evidence that the '325 Patent is invalid. 35 U.S.C. § 282; *Gemmy Indus. Corp. v. Chrisha Creations Ltd.*, 452 F.3d 1353, 1358 (Fed. Cir. 2006). In the preliminary injunction context, while it is Carestream's burden to show that it is likely to succeed at trial, Caliper "bears the burden of proof on the [validity] issue at trial [and] must establish a substantial question of invalidity or unenforceability, i.e., that it is likely to succeed in proving invalidity or unenforceability of the asserted patents." *Abbott Labs v. Andrx Pharms., Inc.*, 473 F.3d 1196, 1201 (Fed. Cir. 2007).

In other words, Caliper must identify at least some persuasive evidence of invalidity even at the preliminary injunction stage in order to overcome the '325 Patent's presumption of validity. *Canon Computer Sys.*, 134 F.3d at 1088. Even if Caliper can identify

-16-

some evidence of invalidity, at this stage in the case Carestream is held to a less stringent standard; Carestream need only show a "clear case supporting the validity of the patent in suit." *Abbott Labs. v. Sandoz, Inc.*, 500 F. Supp. 2d 807, 817 (N.D. Ill. 2007).

The '325 Patent enjoys the same presumption of validity during preliminary injunction proceedings as it does at other stages of litigation. *See Titan Tire Corp. v. Case New Holland, Inc.*, 566 F.3d 1372, 1377 (Fed. Cir. 2009). If Caliper does not challenge validity, the presumption of validity is sufficient on its own to satisfy Carestream's burden of showing a likelihood of success on validity issues. *Id*.

### 1.    Caliper Cannot Rely Upon Its Filing Of A Request For Reexamination.

The '325 Patent will withstand any challenges to validity. Caliper will no doubt point to its request for reexamination of the '325 Patent that it submitted to the United States Patent and Trademark Office (the "Patent Office"). Caliper's reliance, however, is misplaced. All that Caliper has done—concurrent with its launch of infringing product—is request the Patent Office to begin reexamination proceedings. Caliper's request has not been granted. Caliper's ministerial step of filing its request does not strip the '325 Patent of its presumption of validity before this Court. If it did, any entity anticipating infringement litigation would be motivated to file a request for reexamination—however specious—as a hedge against preliminary injunction risk. At least one court has cautioned against the formulaic use of reexamination procedures to manipulate litigation. *See BarTex Research, LLC v. FedEx Corp.*, 611 F. Supp. 2d 647, 652 (E.D. Tex. 2009) ("The potential for use of the reexamination process as a dilatory tactic must be considered [in deciding whether to stay litigation pending reexamination].").

Moreover, even if the Patent Office were to grant Caliper's request and begin reexamination, the grant of reexamination would demonstrate nothing. A majority of requests for reexamination are granted by the Patent Office, but only a small fraction of those grants eventually result in a rejection of all of a patent's claims. *Amphenol T & M Antennas, Inc. v. Centurion Int'l, Inc.*, No. 00 C 4298, 2002 WL 32373639, at *1 (N.D. Ill. Jan. 17, 2002) ("86% of requests are granted . . . but only 12% if those grants results in a rejection of all patented claims"). Indeed, the Patent Office's grant of a reexamination in no way "establishes a likelihood of invalidity." *Hoechst Celanese Corp. v. BP Chems. Ltd.*, 78 F.3d 1575, 1584 (Fed. Cir. 1996) ("We take notice that the grant by the examiner of a request for reexamination is not probative of unpatentability. The grant of a request for reexamination, although surely evidence that the criterion for reexamination has been met (i.e., that a 'substantial new question of patentability' has been raised), does not establish a likelihood of patent invalidity.").

As one district court within the Seventh Circuit has stated, "[a]s a probative matter, the Patent Office's decision to grant reexamination casts the validity of the patent into some doubt, but only to a small degree. . . . The likelihood that some or all of the patent will be invalidated as a result of the reexamination proceedings is impossible to calculate with any reasonable degree of certainty, but statistically, it is not great." *Amphenol*, 2002 WL 32373639, at *2.

In fact, courts have recognized that there is a "substantial likelihood" that the Patent Office "will uphold some or all of [the] claims [of a patent undergoing reexamination]." *Presidio Components Inc. v. Am. Tech. Ceramics Corp.*, No. 08-CV-335-IEG, 2009 WL 3822694, at *2 (S.D. Cal. Nov. 13, 2009); *see also BarTex*, 611 F. Supp. 2d at 653 (noting that the statistically insignificant number of *inter partes* reexamination certificates granted since 2001

-18-

prevents conclusions based on reexamination, even where the Patent Office initially rejects all claims).

### 2. Any Merit Of Caliper's Self-Serving Reexamination Request Is Speculative.

Even if the Court were to consider the materials before the Patent Office in Caliper's reexamination request, those materials yield no probative value as to the validity of the '325 Patent. First, the reexamination proceedings—if they go forward—are in their infancy and consist solely of self-serving materials submitted by Caliper. *See Presidio*, 2009 WL 3822694, at *2.

Further, if anything, the substance of Caliper's request shows how unlikely it is that the '325 Patent will emerge from reexamination with the scope of its claims limited to any appreciable extent. Caliper's reexamination request contains only obviousness arguments under 35 U.S.C. § 103. Anticipating references under 35 U.S.C. § 102, if any were to exist, would provide a much clearer argument for unpatentability. The fact that Caliper's request contains no Section 102 reference is a tacit admission that no anticipating references exist.

These reasons present a clear case supporting the validity of the '325 Patent and confirm that Carestream is likely to succeed on the merits of its claim against Caliper. As set forth above, if any prediction can be made from the nascent reexamination proceedings, it is that the '325 Patent will remain valid, in substantial part if not in the whole.

### III. THE BALANCE OF HARDSHIPS FAVORS CARESTREAM.

In evaluating the balance of hardships, a "court must balance the harm that will occur to the moving party from the denial of the preliminary injunction with the harm that the non-moving party will incur if the injunction is granted." *Hybritech*, 849 F.2d at 1457. Any non-compensable harm that may be suffered by Caliper by a wrongful preliminary injunction is

clearly outweighed by the disastrous consequences of the failure to enter a preliminary injunction in Carestream's favor.

A.    **As The Market Entrant, Carestream Will Be Crippled By The Loss Of Market Share, Customers And Reputation**

Caliper may claim that it will suffer the same kinds of irreparable harm if a wrongful preliminary injunction is granted that Carestream will suffer if a preliminary injunction is not granted.  Even if that were so, however, the benefit of the doubt generally goes to the patentee.  As the Federal Circuit has stated, "an alleged infringer's loss of market share and customer relationships, without more, does not give rise to the level necessary to overcome the loss of exclusivity experienced by a patent owner due to infringing conduct."  *Pfizer, Inc. v. Teva Pharms., USA, Inc.*, 429 F.3d 1364, 1382 (Fed. Cir. 2005).  Accordingly, the balance of hardships weighs heavily in favor of issuing a preliminary injunction.

In addition, Caliper, as the market leader by a huge margin is better able to bear any non-compensable effect of a wrongful injunction.  The loss of the market share, customer relationship, and reputation attendant on each sale constitutes a serious irreparable injury to Carestream.  (*See* SOF ¶¶ 25-51; McLaughlin Decl. ¶¶ 25-51.)  Carestream is a new entrant trying to earn a critical mass of market share to ensure its long-term viability.  Because it has such a small share, each sale is a significant opportunity.  Caliper, on the other hand, will not be affected by the loss of each sale.  It will keep the market share, customer base and reputation it already has and, at worse, will be denied only a small percentage increase.  Because Caliper is better able to bear any non-compensable loss—while Carestream may be crippled—the balance of harms favors Carestream.

-20-

**B.    With Knowledge Of Carestream's Invention And In The Face Of The Pending And Now-Issued Patent, Caliper Nevertheless Appropriated The Invention And Proceeded To Sell Imaging Equipment Utilizing It.**

Furthermore, Caliper cannot claim hardship in its favor because any hardship would be the result of its decision to launch its infringing product at its own risk. An infringer's self-inflicted hardship from the calculated risk taken in selling an infringing product deserves no weight in the balance of hardships. *See Henkel Corp. v. Coral, Inc.*, 754 F. Supp. 1280, 1323 (N.D. Ill. 1990); *Sanofi-Synthelabo v. Apotex, Inc.*, 470 F.3d 1368, 1383 (Fed. Cir. 2006) (rejecting infringer's hardship claim whose "harms were almost entirely preventable" and were the result of its own calculated risk to launch its product prejudgment).

Caliper took a calculated risk in copying Carestream's inventions and bringing its infringing Lumina XR to market when it had to be aware of Carestream's pending patent. Accordingly, any non-compensable harm to it from this lawsuit or from a preliminary injunction is "self-inflicted." Nevertheless, Caliper gained significant strategic advantages from jumping the gun and selling its infringing product—advantages that it will retain even if Carestream prevails. The Court should not allow Caliper to profit from its copying in a way that cannot be disgorged if and when Caliper is found to have infringed the '325 Patent.

## IV.    THE PUBLIC INTEREST FAVORS THE ENTRY OF A PRELIMINARY INJUNCTION.

The public interest favors granting a preliminary injunction in this case. It is in the public interest to enforce patents to encourage others to invent and utilize the patent system. Carestream properly sought and was granted a patent for its multi-modal imaging innovations and Carestream is entitled to the Court's protection of the '325 patent. Moreover, the public interest will be served by issuing the preliminary injunction requested by Carestream, because "[t]here is a public interest in enforcing the protections secured by valid patents." *Techtronic*

-21-

*Indus. Co., Ltd. v. Chevron Holdings Ltd.*, 395 F. Supp. 2d 720, 737 (N.D. Ill. 2005) (citing *Hybritech*, 849 F.2d at 1458); *Sanofi-Synthelabo*, 470 F.3d at 1383 (The Federal Circuit has "long acknowledged the importance of the patent system in encouraging innovation. Indeed, the encouragement of investment-based risk is the fundamental purpose of the patent grant, and is based directly on the right to exclude."). Furthermore, the Federal Circuit has consistently held that absent any other relevant concerns, the public is best served by enforcing patents that are likely valid and infringed. *See, e.g., Sandoz*, 544 F.3d at 1362.

## CONCLUSION

For all the foregoing reasons, Carestream Health, Inc. respectfully requests the Court grant its motion and enter an order preliminarily enjoining Caliper from marketing or selling its infringing products.

Dated:  July 9, 2010                          Respectfully submitted,


                                              ____/s/ John A. Bannon_____
                                              John A. Bannon
                                              SCHIFF HARDIN LLP
                                              233 S. Wacker Drive, Suite 6600
                                              Chicago, Illinois 60606
                                              312-258-5500 tel.
                                              312-258-5600 fax
                                              jbannon@schiffhardin.com

Of counsel:

Stephen M. Hankins
Paul M. Previde
SCHIFF HARDIN LLP
One Market
Spear Street Tower, Thirty-Second Floor
San Francisco, CA 94105
415-901-8700 tel.
415-901-8701 fax

Luke T. Shannon
Shelley L. Merkin
SCHIFF HARDIN LLP
233 S. Wacker Drive, Suite 6600
Chicago, Illinois 60606
312-258-5500 tel.
312-258-5600 fax

                                              **Counsel for Plaintiff**
                                              **CARESTREAM HEALTH, INC.**